MARION B. WILSON v. COUNTY OF BUCHANAN, Appellant.—298 S. W. 842.

Division One, October 10, 1927.

66

*DuVal Smith* and *C. W. Meyer* for appellant.

*Randolph & Randolph* for respondent.

LINDSAY, C.—This is a suit for a balance claimed by plaintiff for grading a road, under a contract with the defendant county. The petition alleges that plaintiff undertook to grade the Easton-Fisher road, in certain governmental sections, under a contract and

bond given by him, in obedience to directions to be given from time to time by the county surveyor, and in accordance with written specifications made a part of the contract; and that the county agreed to pay therefor seventeen and one-half cents per cubic yard of earth moved. It is alleged that plaintiff performed and completed the work, according to the contract, and that in doing so, moved 82,000 yards of earth, which, at the price agreed, entitled him to payment in the sum of $14,350; that the representatives of the county measuring the work, made a gross and palpable mistake, and allowed plaintiff as for earth moved only 32,717.8 yards, or 49,282.2 yards less than the amount of earth actually moved. It is alleged that the work was accepted by the county, but that the measurements and estimates of the county's engineer were false, fraudulent and grossly incorrect and inadequate, and that there is owing to plaintiff for said work the sum of $8,624.35.

The answer, after a general denial, admitted the making of the contract; and next, pleaded that plaintiff "in performing said contract, moved not to exceed 48,130 yards of earth, and that he has been fully compensated therefor, and final payment made to him on said contract." The answer also pleaded the following provision of the contract. "The grading will be paid for by the cubic yard of excavation only, and the figures of the Highway Engineer on final estimate shall be taken as final." It was then alleged "that said final estimate was duly made, and payment made to plaintiff in accordance therewith, and that said final payment was accepted by the plaintiff."

The reply was a general denial.

There was a verdict for plaintiff in the sum of $4,312.18, which was one-half the amount sued for. Defendant appealed, and plaintiff also appealed. By mistake of the clerk, the appeals were allowed to the Kansas City Court of Appeals; and upon motion that court properly transferred the cause to this court. [Constitution, art. 7, sec. 12.] The plaintiff is not pressing the appeal taken by him, and the cause is to be considered upon the appeal of defendant.

The defendant insists that error was committed in the refusal of the court to give the peremptory instruction offered by defendant at the close of the plaintiff's case, and again at the close of the whole case. The contention of defendant is put upon two grounds: First, that the evidence for plaintiff as to the moving of any earth in excess of that allowed and paid for, is vague and indefinite, and insufficient to support the verdict, which, it is urged, was based upon conjecture; and second, that the evidence showed a final settlement with plaintiff, and final payment to him, made without fraud or gross error; and that plaintiff is bound thereby. Complaint is also made of the admission of certain testimony, and the giving and refusal of certain instructions.

The contract was made in October, 1917, and the work done thereunder was completed in July, 1918. This suit was brought in February, 1923. In August, 1918, after the completion of the work, a warrant was issued to the plaintiff for $1,422.75 containing a recital that it was for final payment for grading the Easton-Fisher road. Plaintiff cashed this warrant. The contentions and the evidence as to the claim of mistake, then and thereafter made by the plaintiff, will be noticed later. The determinative question in the case is whether in measuring and estimating the number of yards of earth moved, a gross mistake was made.

At the time of the making of the contract, one Ray L. Cargill was County Highway Engineer. He continued to be such until about the time, or shortly after, the work was completed, when he resigned and moved to Kansas City. He was succeeded by H. L. Meyer, who had been his assistant. The final measurement or estimate was made by Meyer. Cargill testified that he was a civil engineer, and was engaged almost altogether in that sort of work from 1901 to 1918; that the profile, and an estimate of the amount of earth to be moved, were made by him or under his supervision. This was done before the surface of the road was disturbed. He said he had not seen the profile or estimate since he resigned, but his recollection was that it was approximately 80,000 cubic yards. He was asked what degree of accuracy, as to yardage, the profile should indicate. He answered: "The profiles are not attempted to be made accurate, consequently the estimate would not be accurate. We found in some instances they ran within five per cent and sometimes would go as high as twenty-five per cent, depending upon the amount of bank dirt to be moved. I should say an average of sixteen and two-thirds per cent would be about right. That would run both ways. I think I can safely say it would be more apt to run over. There would likely be more yardage than less." Farther on in his testimony he explained that the profile was of the center line of the road. The surface of the road throughout the width of the cut to be made would not always be of the same level as the center or profile. The estimate of the cut in the center of the road could be made with some accuracy, but it was necessary to add percentages to this, which were estimates, for what was spoken of as bank work. The profile was introduced in evidence, but it is not set out in the bill of exceptions as in the abstract; but the recital is made that the estimate of 82,000 yards was marked thereon.

Robert L. George was produced as a witness for plaintiff. He testified that he lived on the road in question; that he had been in the County Engineer's office for about nine years, but was not a civil engineer; that his position was that of road supervisor; that he helped to run the line. He testified that his only experience in estimating yardage in the grading of roads was that he would read

whether they ran over or under; that he knew nothing about it except when, in the office, he would know whether the estimate went over or under. He was asked, by the court, if he knew anything about estimating the amount of dirt to be moved from a given road or profile. He replied that he did, from observation; that he could go over a given road and estimate about what the dirt would be. He testified that the profile of this road was "around 80,000, or something like that." He described the width of the road at certain places, and depth of the cuts, and he was asked whether in his judgment the profile was correct. He answered: "The profile was on the center line of the road and the boys always added something extra for the cuts. I would think the profile was small enough for the road at that time, anyhow." He also said that the plaintiff "in order to grade out his fills, in places, had to go below his grade stakes. It might have been three or four plowings."

W. B. Hazen testified for plaintiff. He had been working as civil engineer since 1888, with the exception of about two years. He said that he was County Engineer from 1901 to 1907, and had experience in estimating the quantities of earth to be moved for highways and ditches; that in 1921 he undertook to survey and verify the final levels run by H. L. Meyer, upon the road in question, but could not verify them. He said: "While he ran in his cuts, his fills were raised about the profile. His cuts were lower, and west of Easton it was impossible to check on his bench mark at the bridge. He was off, I think, thirteen feet at the bridge. You could not put very much dependence in that kind of levels. . . . I was unable to satisfy myself as to the amount of yards that Mr. Wilson had actually removed. There were places in the cuts that the stakes were remaining in the bank at that time, and Mr. Meyer's notes indicated at that point a certain cut, and our cut was more; and in the fills the same thing was true; this indicated that plaintiff had moved more dirt than Mr. Meyer gave him credit for." On cross-examination he testified that he tested H. L. Meyer's notes all the way through. He was asked what was wrong with them. He answered: "It was not correct. When a man cannot check up within thirteen feet in two miles running the levels, something in that was wrong." The entire length of the road, graded by the plaintiff, was 3.4 miles. Hazen was asked on cross-examination to point out some of the errors from the book of notes handed to him. Referring to the notes made by H. L. Meyer, he said: "He starts out from the town of Easton on a bench mark, which gives an elevation of 8788. He winds up at the bridge with a bench mark minus 934. When you run through levels there, instead of getting an elevation of minus 934, you get an elevation of plus 252." In this connection he testified that the "fact there was a difference in levels, would not necessarily make any dif-

ference in the quantity of dirt removed, unless the error was made all in one bench. . . . But, if the cutting on the ground was different than figured here, it would make a difference, and that is what happened out there in several of those cuts. The book levels given here and the actual cut that was made in the fill were different.'' He testified he knew this, by measuring the cut banks as they stood there. He was further asked to give some indication of error in the notes of H. L. Meyer upon final estimate. He answered: ''At Station 11 he has shown an outside cut on the bank of 1-6 and it is 3-9, and on the other side of the road he shows a fill of 2-4 and it is a fill of four feet. On Station 12 he shows an outside cut of 4-10 against 1 1-10. He shows on the other side a fill of 2-7, I show grade Zero. Station 13 shows on one side 2-8 and I show 4-7, and on the other side he shows grade and I show a fill of 2-3.''

This witness also gave another illustration of error and of the difference between Meyer's notes and his own notes. He said: ''The first hill—when you start from the county line, you have a slight cut, then you get into practically no cut or it is finishing work until you get to the foot of the hill. When you start up that hill, then your differences commence on that hill running all through that hill—running, I think, at the crown of the hill somewhere in the neighborhood of three feet on the first hill, then as it goes over the hill fades out again to zero or nothing, and runs on through that next fill.''

Plaintiff testified that he had been grading for about twenty years upon roads, ditches, railroads and the like; that he went over the road before he bid on it; that he had the profile to go by; that by examining and estimating, and afterwards having them measured, he had been able to test his judgment on those matters tolerably close; that there was as much dirt as the profile called for, or 82,000 cubic yards.

E. P. Olson, also introduced by plaintiff, testified that he was a grading contractor and had been such for twenty-five years; had done county road work, state road work, building levees, railroads, and all kinds of earth work; that before the Easton-Fisher road was let, he went out and looked over it; that he looked over the profile, which showed about 82,000 yards; that he figured there would be something like 80,000 yards; that from the experience he had, he could generally determine or estimate whether the engineer's estimate was correct.

H. L. Meyer, called by defendant, testified that he traced the profile, and that Cargill checked it over and made from his (Meyer's) figures the estimate of 82,000 yards. Meyer insisted that his final calculations were right. His testimony is not easily understood. On his cross-examination the following appears:

''Q. Was the road graded in accordance with that profile? A. Yes, sir.

"Q. You are sure of that, are you? A. Yes, sir.

"Q. When you explained to the jury how you got at the making of the profile, you estimated these areas of dirt to get it?—figured for it? A. Yes, sir; figured it up.

"Q. And when you figured them up, while they were right before you, they made eighty-two thousand yards? A. No, not the figures; I got in here just the center line, just the center line of the road; the cross sections we made later on.

"Q. You made those figures after the dirt was removed? A. No, before it was removed, after Mr. Wilson got the contract.

"Q. Did you make the figures after the dirt was removed? A. No.

"Q. Didn't make any at all? Were the levels re-run to check the finished work? A. Who did?

"Q. Were the levels re-run to check the finished work? A. No, sir.

"Q. They were not? A. No.

"Q. Were the stakes marked the same as in the book? A. Yes, as far as I have seen of them.

"Q. Do you know now whether those stakes were marked the same as in the book? A. That is the only way I had of checking.

"Q. Did you mark the stakes? A. No, sir.

"Q. You don't know whether the stakes were marked the same except by hearsay? A. The stakes were not all in when I went out there to check them up."

He was recalled, and the following shows his re-direct examination and recross-examination:

"Q. Mr. Meyer, when you were out there making your final estimate, you just took the tape-line and didn't use any instruments? A. No, sir.

"Q. Did you use an instrument? A. No, I used a tape-line.

"*Re-direct examination*, by Mr. Meyer.

"Q. But the original estimate figured by Mr. Cargill, do you know whether anybody ever checked it or not? A. I checked it, but I could not get any quantity like that.

"Q. On the original estimate you didn't figure any such amount? A. After I went out, Mr. Wilson asked Mr. Cargill to check my figuring and I checked his figures off the profile.

"Q. Your figures did not make anything like 82,000? A. Not from figuring the center line profile.

"Q. Could you really make anything like the same estimate from the center line profile? A. You would not hit it ten per cent from one way or the other, probably twenty per cent.

"*Recross-examination*, by Mr. Randolph.

"Q. What I was getting at was, when you were making the estimate upon which you ordered Mr. Wilson paid, you used the tape-line? A. No, I used the instrument then.

"Q. I meant finally. When you finally did that, you used the tape-line? A. In getting the final check upon his work the last thing I did was to locate the station, and wherever the stakes were out, of course my book showed what the cuts would be.

"Q. You used the tape-line then and not the transit? A. Yes, I used the tape-line."

David Lawler, an engineer called by defendant, testified that he had checked over Meyer's figures; that his "multiplications and subtractions were correct with a few exceptions;" that he "took Meyer's figuring; . . . that if the figures were not right, of course the quantities could not be right." He said he was sent out to run the center profile and did so.

"Q. Did he have his elevations right? A. I went and ran the center profile and it checked very nicely for the first five or six thousand feet, and after that it did not seem to check any more.

"Q. It was off as much as thirteen feet at one time? A. That was at the end."

The total length of the road in feet was about 18,000 feet.

J. R. Leslie, another civil engineer, called by defendant, said that he made a computation from Meyer's notes; that in checking over Meyer's notes he made a difference of 1190 cubic yards, that is, using Meyer's figures, he found that much more than Meyer's final figures showed. Several engineers were asked as to the ordinary correctness of the computations of competent engineers in making estimates of this character. In effect, their testimony was, that in estimating this class of work, they took the center line or profile; estimated that, as near as they could, and then would add a percentage of fifteen to twenty-five per cent, according to the circumstances; and, that such estimate should then be accurate to within ten to twenty per cent; that a discrepancy or shrinkage of fifty per cent or sixty-five per cent was too much; or, as one of them put it, that it "could not have been an estimate, if there was that much difference."

One of the engineers called by defendant expressed the obvious fact by saying if there was a discrepancy or diminution of five-eighths, between the estimate and the final figures, one or the other was wrong.

At this time, in view of a contention made by counsel for plaintiff, we recur to the allegations of the pleadings. The plaintiff's suit was upon a written contract, with specifications, made a part thereof. His claim was that he moved 82,000 cubic yards, and that in the final estimate, through a gross mistake, he was allowed and paid for only 32,717.8 cubic yards. The answer alleged that in performing the said contract, plaintiff moved not to exceed 48,130 yards of earth, and had been fully paid therefor. Counsel for plaintiff urge that this is an admission that plaintiff moved the difference between 32,717.8 yards and 48,130 yards under his contract, for which he was not paid.

However, the testimony shows that plaintiff did what was spoken of as extra work or "force work" additional to that specified in the contract, and, as the evidence seems to indicate, at a place or places not expressed in the contract, and that this amounted to about the difference between the 32,717.8 yards, the final estimate under the contract, and the 48,130 yards mentioned in the answer. The plaintiff seems to have been paid for this extra work or "force work."

The issue under the testimony rests upon the original contract and its performance; and, as we understand the testimony, there is no controversy about the extra work or "force work," done additional to, or outside of, the original contract; but the issue is as to whether there is evidence to go to the jury that a gross and palpable mistake was made in the final measurement of the work done under the contract. A rule applicable under the issue, is stated in Williams v. Chicago S. F. & C. Ry. Co., 112 Mo. 1. c. 495: "While the courts with great unanimity sustain stipulations providing that the work shall be done under the direction and supervision of the engineer, and his estimate shall be final and conclusive upon the parties to the contract, they have also concurred in saying that the engineer's estimate may be assailed for fraud, gross error or mistake. [Railroad v. March, 114 U. S. 549; Sweet v. Morrison, 116 N. Y. 19; Brush v. Fisher, 70 Mich. 469; Perkins v. Giles, 50 N. Y. 228.]"

In considering the evidence under the demurrer at the close of the whole case, the plaintiff must be given the benefit of all the testimony in his behalf, and of any favorable testimony given by defendant's witnesses, and the benefit also of all reasonable inferences to be drawn therefrom. [Lindsay v. Shaner, 291 Mo. 297; Montague v. Railway, 305 Mo. 269; Lorton v. Mo. Pac. Ry. Co., 306 Mo. 125.]

There is no testimony that there was any actually corrupt or wilful purpose to wrong the plaintiff; nevertheless, there is the question whether a mistake was made, and whether that mistake was so gross as to constitute a fraud upon the rights of the plaintiff. If, as certain evidence favorable to plaintiff tended to show, there was approximately 80,000 cubic yards of earth moved, under the contract, then, the final estimate of only 32,717.8 yards attributable to the contract, and the work done thereunder, was a discrepancy of such magnitude, as must be deemed a gross mistake, and amounting in law to a fraud upon the plaintiff.

It is apparent that there was a gross mistake in one respect or another. If the original estimate was approximately correct, that is, within limits the one way or the other, as those limits were fixed by the engineers in their testimony, then the final measurement as given by Meyer must have been far below what was actually done. If, on the other hand, the final estimate was approximately correct, the original, founded upon the profile, was grossly excessive. Defend-

ant's counsel suggest that the marking of the estimate, as being 82,000 cubic yards, was a clerical error, and that the "8" should have been a "3;" but this is not supported by any evidence, nor was it suggested upon the trial.

Cargill, who had not seen the papers for several years and testified from his recollection, said the estimate was around 80,000 cubic yards.

Plaintiff's witness Hazen, an engineer of long experience, made his survey and examination several years after the work was done. Preliminary to this, he copied Meyer's notes. He was positive in his statement, that plaintiff had moved more earth than he was allowed by Meyer in his final measurement, but he would not undertake to say how much more. He said: "I don't feel that I could justify myself with the notes running as they did in setting down and saying there were so many yards moved." He said there was some change in the original surface of the ground; that he could determine the original surface of the ground only by Meyer's notes, and that the notes were not correct; that for two miles or about two-thirds of the length of the road, he could not check with them. His illustrations of this have already been given.

Defendant's witness, engineer Leslie, using Meyer's figures, found an error of 1190 cubic yards as a result of miscalculation by Meyer upon those figures. Aside from the foregoing, the evidence for plaintiff was opinion evidence of two kinds. First, there was the opinion of the engineers that the estimate based upon the profile should not be wrong beyond certain percentages mentioned by them. The other consisted of opinions as to the quantity of earth moved, based upon observation of the road, and experience in that kind of work, and given by the plaintiff himself, by the witness Olson, and also by the witness George.

Counsel for defendant urge that the opinions, of the plaintiff and of the two other witnesses just mentioned, were improperly received in evidence, and were no more than a guess. The record shows that the opinion or estimate stated by the witness Olson, went in without objection on the part of defendant. His testimony was that he had been a grading contractor for twenty-five years; that before the work of grading this road was let, he went out and looked over it; that he also looked over the profile; that it showed the estimate to be 82,000 yards; that he had experience enough to enable him to make his estimate, as to whether the engineer's estimate was correct; that in doing the work that was what he generally did; that he "figured there would be in this work something like 80,000 yards."

Witness George, who was in the county engineer's office and had been for about nine years, said he was out all the time on these jobs at work. He was asked whether in his judgment the estimate of 82,000 cubic yards was an over or under estimate. To this, objection was sustained. He was asked by the court whether he knew any-

76

thing about "estimating the amount of dirt to be removed from a given road or profile." He replied that he did, and that he could go over a given road and estimate about what the dirt would be; that he helped to run the lines, helped "the boys stake and run the lines." He testified that his way of estimate was to take the center line of the road, and make estimate from that. After that, he testified as to the width of the road in places before grading, and the width, thirty-six feet, to which it was graded to the foot of the cuts; that there were places on the road where it was not over ten to twelve feet wide before it was widened and graded. He testified as to the depth of a number of the cuts. The court admitted over objection, his judgment or estimate that the yardage was in the neighborhood of 80,000 cubic yards.

The plaintiff was asked as to his ability from experience to judge of the quantity of dirt removed on any job of which he had charge. In substance his testimony was that by examining and estimating, and afterward having them measured, he had been able to test his judgment in these matters "tolerably close," and his judgment was, there was as much as 82,000 cubic yards. This testimony was given without objection on the part of the defendant. As another way of getting at the result, the plaintiff was asked, and testified, that he knew from experience, the cost ordinarily involved in moving earth. He said that he took his time book, and figured the time on the Easton job, which he turned into day work, and said that the way it figured out, he lost $8,000. Upon objection by counsel the answer that he lost $8,000 was stricken out. He was then asked by the court to state from what he spent upon the work, and taking into account what the ordinary cost of moving dirt was, about how many yards he moved upon this work. This was objected to; the objection overruled, and he stated, that, based upon the cost of moving it, the quantity would be about 103,000 yards.

Summarizing the foregoing, there is the testimony of defendant's witness Leslie that using Meyer's final figures, he found an error against plaintiff of 1190 cubic yards; and there is the further testimony that Meyer's notes could not be followed or would not check, for at least two-thirds of the length of the road. Plainly there is evidence from which error could be found, against plaintiff, in the final estimate. Under the conditions shown in the testimony, the exact amount of that error was not susceptible of an absolutely accurate calculation, aside from the error pointed out by Leslie, and that was upon the assumption that Meyer's figures were correct, but a miscalculation upon them was made by him. The grossness of the error was a matter of opinion upon the question of the quantity of earth moved by the plaintiff. "The witness may state his estimate of quantity, either absolute, comparative, or as deemed requisite for

a future result, provided he appears to possess sufficient knowledge and data upon which to ground an inference, and he shows this by stating the facts on which his inference is based.'' [22 C. J. page 567.] Olson's opinion was founded upon examination of the profile, and of the road itself before the work was begun, as tested by his twenty-five years of experience in that kind of work. Similarly also, the plaintiff and the witness George, with the addition that they saw the work in process and its completion.

We have examined the opinions in Rothwell v. Dean, 60 Mo. App. 428; Pope v. Ramsey, 78 Mo. App. 157, and other cases cited by counsel for defendant. We have reached the conclusion under all the evidence tending to show mistake, and under the conditions shown, that the question of the grossness of the mistake was not susceptible of exact calculation, and that the opinions of persons having experience in that kind of work, and who had made observations of it, were admissible. We are not cited to any authority upon the question of admissibility of the statement of the plaintiff, that, estimated according to the cost, the amount would be about 103,000 yards. That statement we regard as of doubtful propriety, but under the circumstances here shown do not hold it constitutes reversible error.

Defendant complains of Instruction 2, which is as follows:

''The jury are instructed that if the plaintiff, upon receiving the warrant in evidence marked 'final payment' complained that a mistake had been made and that he was not being paid for the full amount of earth moved by him under the contract in evidence, and the engineer agreed to look into the matter or in any manner agreed to leave the matter open, then there was no final settlement and the plaintiff is entitled to a verdict of all the earth moved by him under his contract, for which he has not received payment. And the jury are further instructed that receiving said warrant would not be final and conclusive on plaintiff, if there was a mistake in the engineer's final estimate as defined in Instruction 1.''

Instruction 1 was the instruction on the theory that a gross mistake was made, and authorizing a recovery under that theory. The objection made to Instruction 2 is that there is no evidence upon which to base it, and that no such issue was made by the pleadings. The plaintiff testified that on the day Meyer gave him the statement of the final amount, he complained, and said this was not final; that Meyer said it was. Plaintiff rejoined that there was more than that coming, and said he took the statement, and went down and got the warrant. He also testified to some further inquiry as to whether Meyer's estimate was final, and being informed that it was, saw Cargill a day or two afterward, and told him about it; that Cargill said, ''Sure that is wrong,'' and that he would send somebody out and check it again, and said to plaintiff: ''Just leave it to me and I will

see that you get it.'' It appears that shortly after this, Cargill resigned and went away, and plaintiff took the matter up again with Meyer, and on one occasion he and Meyer went to Kansas City to see Cargill, and plaintiff and Hazen also went together to see Meyer about it. His visits and complaints to Meyer seem to have continued for about two years or until Meyer went out of office. Cargill, in his testimony, referring to the complaints of the plaintiff, said there was no doubt something of the kind, as testified to by plaintiff, had happened. In the final part of plaintiff's testimony he said he complained when he got the warrant, and before he cashed it told Meyer it was not right; that Meyer said he guessed it was; that Cargill said he would make it right, and he relied on Cargill's statement.

In considering the objection here made, that there was no evidence upon which to base the instruction, the conduct of the parties should not be disregarded. Meyer, who made the final figures was at that time the assistant, or deputy, of Cargill. Cargill promised to have the estimate re-checked. This was done by another assistant, the witness Lawler, who, as heretofore shown, attempted to check the center profile as made by Meyer, and found, as he said, ''it checked very nicely for the first five or six thousand feet, and after that it didn't seem to check any more.'' He further said that he found no serious error in the multiplications and subtractions made by Meyer, but that if his figures were not right, of course the quantities could not be right. Apparently, it was after this was done that Meyer and plaintiff went to see Cargill, in Kansas City, and reached no further agreement, and thereafter, the matter continued without result until the suit was brought. Under all the evidence, and the circumstances shown, we conclude that the question whether the estimate of quantity was held to be final, or still open for revision and correction, was one for the jury.

The other objection made to the instruction is that no such issue was made by the pleadings. We think it is not subject to that objection, because, the defendant pleaded the acceptance by plaintiff of final payment, and this was denied by the reply.

Complaint is also made of the refusal of the court to give defendant's Instruction B, which would have told the jury that if the plaintiff knew or had reason to believe, that he had moved more dirt than the final computation of the highway engineer indicated, when ''plaintiff accepted final payment under his contract,'' then the verdict must be for defendant. This instruction was properly refused.

It is urged that the verdict was based on conjecture and should not be allowed to stand. The amount of the verdict, although one-half the amount sued for, indicates plainly that the jury found that a gross mistake had been made. The exact amount of the mistake

was not susceptible, under the circumstances, of an exact determination. The verdict is based in some measure upon exact calculation, and in a greater measure upon opinion.

We find no error committed which requires a remanding of the cause, and the judgment is therefore affirmed. *Seddon* and *Ellison*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by LINDSAY, C., is adopted as the opinion of the court. All of the judges concur.